hearing that was held yesterday before Judge Robinson, that is relating to the use of pentobarbital. We have David Wyckoff, to the extent there are any questions pertaining to the habeas petition that was filed on the 25th, I believe, and the 2244 petition. And then on behalf of the state, we have Paul Wallace and Gregory Smith. Will there be any division of argument, Mr. Wallace? Yes, Your Honor, there will be. I will, Paul Wallace, I will be doing the pentobarbital claim, and Mr. Smith will be addressing any questions, if there are any, about the request for a successive habeas. Got it. Okay. Mr. Weissman, why don't you begin then? Sure.  Given the circumstances that we find ourselves in, in terms of the time here, I think I'd like to get immediately to what we perceive to be the critical issue before the Court. What is unknown about pentobarbital is how long after it is injected that it renders a person insensible to significant pain. That's in significant contrast to thiopentol, the prior drug, and Judge Robinson, in her trial, Jackson 1, she said, quote, the dose of thopentol used by Delaware would render most people unconscious within 60 seconds from the time of the start of the administration. By the time the entire 3,000 milligram dose is injected, it is my further opinion, and she's there referring to the defendant's expert, Dr. Dershowitz, that almost 100% of the population would be unconscious. And that's at 601 F sub second. Right. We've been through. Let me just, as I understand the test, and I know Judge Fisher wrote the opinion on this case with regard to the prior protocol last year, but as I understand the test in Bayes, and I'm quoting, the condemned prisoner establishes that the state's lethal injection protocol creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives. So it looks like it's two tests, two parts to a test. Is that correct? Well, actually, Judge Fisher's opinion adopted the substantial risk of serious harm aspect of Bayes, and our view is that that's the predominant test in Bayes and in this court's opinion. But I think the really salient point about what test applies is that we are dealing here with an unknown, and it's our view that it's simply inappropriate to apply a burden on us to show a substantial risk when the defendants have selected a drug that has absolutely no track record in use as an anesthetic. Our expert has opined, and this is at DI-154-2, which is Dr. Wiesel's report at page four, that this is an untested and unsafe drug. He says, quote, there's no relevant clinical reference dose on which to determine what dose would cause clinically adequate depth of anesthesia. Now the question then becomes, but doesn't that cut against you? In other words, if you need to show, and at least in the response of Chief Justice Roberts to Justice Stevens' concurrence, if you need to show, establish a demonstrated risk of severe pain, if that's at least part of the test, and you don't know, isn't the burden yours to make that cross that divide? No. No, and the reason is this, Your Honor, Bayes was dealing with the question of maladministration of a known, historically well-known anesthetic, and that's why I was reading you the quote from Judge Robinson's opinion. There was no question, and we didn't contest, that if biopental was properly administered, within 60 seconds, virtually everyone in the population would be insensible to significant pain. So Bayes was written assuming the use of a known anesthetic that would have that effect. What we're dealing with here is a drug that has no track record. We don't know, and the defendants simply do not know themselves when this drug, pentobarbital, is going to cause a person to become insensible. Certainly, eventually pentobarbital and the dose it's going to be given in will cause death by itself, and that's why, for example, Ohio uses it as a one-drug protocol. Well, in fact, in the prior case before us, the one that the opinion came out from Judge Fisher, wasn't it, I thought what you had said in that, or someone on your behalf, Mr. Fisher, that we use Ohio's massive overdose, that is 5 grams of pentobarbital, and in fact that's what's being done here. No, I respectfully disagree, Your Honor. What's being done here is that's being given first. It may take 8 minutes for that drug to put the prisoner into a proper plane of anesthesia such that he's insensible to pain. Yeah, but doesn't, when you look at the protocol, isn't the protocol much broader than just the three-drug sequence? The protocol also are the steps that Delaware has required themselves to take that the prisoner is in a state of unconsciousness. Yes, I think that's Judge Fisher, that's true, however, the consciousness check that you're referring to, which takes place after 2 minutes, is an eye brush, or a touching of the eyebrow, a shaking of the shoulder, and perhaps a calling of the name. It's our view that a person can be laying with their eyes closed and still and meet those tests, that consciousness test, however, they still might be sensible to pain. They still may be able to feel the significant pain that would be caused by the injection of the second two drugs, and that's the critical difference between pentobarbital and thiopentol. Pentobarbital we simply don't know, and the defendants can't tell you, that when, after the injection of that drug, the prisoner is not going to feel the pain. Just because he's laying there with his eyes closed, and his shoulder is shaking, and he doesn't respond, doesn't mean that he's not going to respond when the second two drugs are administered. And that's the critical issue here. We simply don't know. But I keep coming back, but who has, I don't know, is that, does that prove your case? It proves our case because on the substantial risk of serious harm, it is our view that Bayes did not mean to apply that when they're using a non-proven anesthetic. If they were using saline solution, you know, or some drug that, you know, like pentobarbital, we just don't have any track record on knowing, and again, read what our doctor says. There is no clinical reference dose to determine when that would cause a clinically adequate death of anesthesia. Anesthesia is not an on or off proposition. In large measure, it seems that the reason there haven't been a whole lot of clinical studies is because this is not used as an anesthetic or anesthesia for regular operations because it's extremely difficult to get someone out of this type of coma, which is exactly the thing you don't want to have happen. So, but it seems as if the test that's been given to us, whether you say, whether it's what I had suggested to you from Bayes or even a more narrow version of that, it still seems the ball is in your court to show in some way, shape, or form that what is done here is ineffective to anesthetize before the administration of the second and third doses. I understand your honest point and I respectfully disagree. It's simply unfair to put us in a position of having to prove what is unprovable. There's no, there's just no data out there for us to show. Now, let me say that there is a second standard here that also applies, which is the comparative risk standard, which we believe Judge Robinson erred on, and then the comparative risk standard applies when we have proffered an alternative. We have proffered two alternatives in this case. One is obviously the one drug protocol and the second is, is that the defendants can select an FDA approved anesthetic that is used all the time in surgery and we would have no complaint then. At that point, we would be back within the four corners of Bayes because it is a known anesthetic and they have chosen, for whatever reason, not to select a known FDA approved. I mean, remember, this is not approved by the Food and Drug Administration for this purpose and it may be a good reason. Maybe it's because it's hard to get someone out of that, that, that coma, but the bottom line from our perspective is that leaves us in a position of having to prove something that is unknowable under the substantial risk of serious harm standard. And I think that unknowns, it should be initially up to the defendants to prove to this court or to prove to Judge Robinson in our 60B motion that this is an effective anesthetic. How long will it take to, to, to render a person at the anesthetic depth they need to be to withstand the, the injection of the second two painful drugs? It just seems manifestly unfair. In fact, there's an... Let me stop you a second there. Telephonically, maybe it's tough to hear one another interrupt here, but we'll try our best. Sure. Judge Fischer again. Yes. Let me go back to a basic here. You're asking for a stay, obviously, but the question is a stay to do what? And the stay that you're asking for, it seems to me, is a stay to give this court a chance to review your appeal from Judge Robinson's decision yesterday to deny your motion under Rule 60B-6. Yes. Is that correct? That's absolutely right. Okay. Now, our review of her decision yesterday is under an abuse of discretion standard. And under that, under Rule 60B, you had to show an extraordinary circumstance justifying the reopening of the final judgment. And the final judgment we're talking about is the final judgment in the case we affirmed in 2010 in Jackson v. Danburg. That's right. Oh. Okay. Now, what's your extraordinary circumstance? Define... I think I know what your answer is, but let's make sure we understand what it is that you offered to the district court and what it is that you want us to review under an abuse of discretion standard. The extraordinary circumstance is the substitution of a drug that is not approved for anesthesia that has no data to tell the defendants or us how long it will take to put the prisoner into a sufficient plane of anesthetic depth so that they'll withstand the second and third drugs. Okay. Now, doesn't that run contrary? I mean, basically what you're saying is every time that there is a change in drugs, you're going to put a court, whichever one, whether it be the district court, us, or the Supreme Court, in the position of acting as a board of inquiry. I respectfully disagree, Your Honor. If defendants had chosen a drug that was approved by the Food and Drug Administration that's used on a regular basis by doctors all over the world to induce anesthesia for surgery, we'd have nothing to say. And I can imagine Mr. Wallace is going to say, oh, they'd figure out something to say. But, I mean, I think we all know that if they had chosen an established anesthetic drug, I'm not sure what I'd be saying. I don't think there would be anything to say. It's not a matter of being a board of inquiry. This is not micromanaging a minor change. This is a fundamental change in the protocol that was approved by this court and by Judge Anticipated the use of an actual, true, real anesthetic. This is not an anesthetic. We don't know how it works. And the proffer we've made is that in two recent executions, we've seen eyewitness accounts, and our expert has interviewed some of the witnesses, and he is of the opinion that the actions of the condemned prisoner during those executions shows that those prisoners were not under an adequate depth of anesthesia. Now, but that's in Blankenship and Powell. Correct. How are the protocols in Alabama and Georgia, respectively, significantly different than Delaware? I don't think they are significantly different. There might be a minor difference in terms of when the consciousness check takes place, but the same problems exist. You know, whether it's a consciousness check after two minutes or three minutes, the point is that there's no way of knowing by simply shaking someone's shoulder. They don't do that in operating rooms. They do certainly much more thorough assessments of anesthetic depth. Now, I'm not saying you'd have to do that, because if they had thiopental, we know that almost 100 percent of the population would be in a proper anesthetic depth within a minute. You've had 18 executions, as I understand it, with pentobarbital. Correct. And we've had two that at least some witnesses believe that there were problems, and in their minds, some question as to whether the person was completely unconscious. Was there any evidence that those were, for lack of a better word, botched executions? Well, I mean, we know what you know. I mean, we think there's significant evidence that they were botched, to use that term, which we use. But, you know, we would need further discovery and evidentiary development of this issue in order to know. For example, when Judge Robinson asked what discovery would you like, we said to her we would envision doing some third-party discovery. Let's get the records from the PAL and Blankenship jurisdiction to see when the drugs were administered, what notes were taken by the members of the injection teams and those who were observing, to see what actually happened. There may be other technical data that's in the possession of those correctional authorities that we think would be fair game in a third-party discovery setting. You know, I really think that, you know, I guess the point I really want to leave the harm until the defendants can come forward and say we're using a proper anesthetic. And if they're not able to do that, which they can't in this case, with a track record, with known data, you know, their own expert, Dr. Dershowitz, in a deposition in 2008, this is DI-154-4, said pentobarbital given by IV is uncommonly used in humans and we have very, very little resolution kinetic data on pentobarbital used in humans and we have even less pharmacodynamic data. Right. In the context of using thiopental for brain protection, the usual dose is an average size, it goes on and on. But as Judge Fischer noted in the prior Jackson case, you know, just to lay it out, there's very different purposes for use of these drugs. You don't want to use this pentobarbital in an operation, but when you're talking about a, you know, a state-administered execution, that's a very different... It is different, but it doesn't... Most respectfully, your question doesn't answer the critical question in this case, which is when does the prisoner reach that depth? Ask Mr. Wallace if he can tell you when the prisoner enters that anesthetic depth so they'll withstand the pain and what he's basing that on. And I think his answer is going to be he can't tell you because there is no data, his expert can't tell you. But as I understand it, all the states that use the injection method have various checks of consciousness at some point, regardless of how many minutes it is, as to how the person is responding. And if the person indeed is conscious, you don't go to the second step or there are indications of consciousness, you re-administer the first drug in the three-drug protocol. I mean, you know, you could even phrase it another way if you were looking for a test. Even the dissent of Judge Ginsburg in the Bayes case says, you know, the real key here is is there an effective administration of a drug to adequately anesthetize? And the checks on that are pretty much universal as to how you do that. And in answer to a prior question, it seems that you're agreeing with that. Beyond those checks, what more can one do? Right. And the answer is that those checks are appropriate when you're using a known anesthetic that has a certain action. We know that sodium thiopentol will render 100 percent of the population at the proper level of anesthesia within a minute. So a check at two minutes will adequately ensure that there hasn't been a maladministration. It simply doesn't answer the question of whether or not pentobarbital has placed the prisoner within that two-minute period in a proper anesthetic depth. And let me just say, it's not just a question of consciousness because you can be unconscious. You could be, you know, drifting off and still not be at the proper anesthetic depth. It's a continuum. It's not you're either anesthetized or you're not. You have to be at an appropriate depth. All the experts can tell you it's sodium thiopentol when that will happen. Their expert says it happens after a minute. And we have no reason to dispute that. I don't think we ever disputed that. We disputed whether the maladministration could take place. But we never disputed that the proper administration of sodium thiopentol would accomplish that purpose. We simply don't know that when it comes to pentobarbital. Again, ask Mr. Wallace when it happens. Ask him, you know. I understand his response he gave yesterday to that. But the question is, rather than his saying when it happens, you've got protocols in place for checks that must be done before you administer the second and the third doses of drugs, I should say. And what suggestions would you have with regard to those check protocols that you would do differently? The checks are fine if you're using a proper anesthetic. The checks are not fine if you're using an unknown drug. And that's simply, that's our position. And we think there's a very sound logic to it. You know, we're not saying do something different with the protocol vis-à-vis the checks. We're saying use a drug that has a record that we can look at, look up in a medical book and have our expert tell us that it will absolutely put the person at a proper level of anesthetic depth within a minute. And then the checks are fine. It's not the checks. It's not any other aspect of the protocol because Judge Fisher's opinion addresses all that, and that's the law right now. It seems as if what you've got only is, and I believe it may have been Dershowitz, but the thought was that, okay, if you've got five, somebody mentioned 5,000 milligrams, which I guess is five grams of penobarbital, his response was that's lethal. Absolutely. When is it lethal? Is it lethal after 15 minutes? Is it lethal after 20 minutes? What level of anesthetic depth is the prisoner at after two minutes? We don't have an answer to that. We concede that eventually five milligrams will kill the prisoner. That's why we suggested it as a proper one-drug protocol. But if you're using the second two drugs, then you have to answer the question, Mr. Wallace has to be able to answer the question, when does the prisoner achieve the proper level of anesthetic depth? He can't do it. Their expert can't do it. He hasn't profited an expert to do it, and that's because there's no answer. There's no data. Okay. Why don't we hear from Mr. Wallace on this issue, and then we'll see if there's any questions for Messrs. Wyckoff and Smith on the 2244 issue. Good afternoon, Your Honor. May it please the Court. The Court has hit the proper standard here on the head, of course, and the problem for the plaintiffs in this case, the appellants in this case, is that they have to show a strong likelihood of success for this court to grant the stay that Judge Robinson denied. And as the Court's already noted, it is an abuse of discretion standard. Well, let me ask you this. Was it an abuse of discretion for the district court to decide the Rule 60B motion on the basis of proffers, that is, evidence submitted in other cases, and not take actual testimony, and I assume not have witnessed the video of the execution last Thursday in Georgia in the Young case? The statement suggests not at all, Your Honor. The Rule 60B generally is one which asks for an extraordinary remedy, and the end judgment that they seek to overrule was that maladministration was not very likely to pose objectively intolerable risk. It didn't go directly to the other parts, as they've said numerous times, but more importantly, under Rule 60B, actually the taking of evidence and discovery is highly extraordinary, in this circuit and elsewhere. And so I believe when Judge Robinson is faced with an issue, and faced with the precise expert that they wish to bring before, and to start many trials on other executions, that, in fact, she undertook what was the appropriate steps that any court would take under Rule 60B. There's evidence of the 18 executions, I guess maybe it was May 18, there were two of them where people believed, I guess they believed strongly, that there were problems, that is, Blankenship and Powell. With all due respect, Your Honor, to the evidence of that, people are the two federal defenders of one of the inmates. All the rest of the witnesses, there's no evidence that they noticed anything that those two persons claimed. And the other one was one reporter. And if you look at Dr. Weissel's indications, he looked at everything and said, oh, I think there's a problem. Even though many, many correctional officers and other persons who watched Blankenship, and we submitted all of the affidavits from that to Judge Robinson to look at. Judge Robinson looked at exactly what the young court looked at last week, because we submitted all of those, including the autopsy of Mr. Blankenship, including the observation to the medical examiner who was, in fact, present, and the coroners who were present, and all of the other witnesses. The reality is, in a dynamic situation like that, and probably a very emotional situation like that, various people are going to have various views. But the reality is also this. If we look at the timing, in Blankenship, at the end, there was the consciousness check before they administered the other drug. So the very thing that they are claiming and they are concerned with in effect. In Blankenship in Alabama, the consciousness check is done at, what, two minutes or five minutes or when? I believe in, well, in Georgia, Blankenship, Your Honor, was five minutes. I'm unsure about Alabama, right off the top of my head, how many minutes it is. But turning to Delaware, the most important aspect of this is there is the consciousness check. And that is, no matter whether it takes longer for this to act, there is a consciousness check, and nothing moves forward until that. And Mr. Wyden won't tell you, and refuses to tell you, what else he believes there needs to be done other than use some other drug. And say there's dozens of drugs out there, they don't offer any of them other than thiopental, because they know it can't be had. But the Department of Correction undertook to use a drug that has been used 18 times, twice. Certain witnesses have said that they believe there was something else, but there's no scientific evidence that that is in fact true. And in fact, even Dr. Wiesel is speculating wholly as to what he believes may have occurred there. Was there any consideration of other drugs for the first step in the protocol besides pentobarbital? Your Honor, not that I am aware of. And I believe the reason for that, in large part, is seeing what was done in other states. Obviously, it's quite clear, if we look, that other states, because you're talking about a unique activity here, the judicial execution of a human being in a way that's consistent with the Eighth Amendment, to look at what other jurisdictions have done, and whether they have done it properly, is the most appropriate way to deal with it. And interestingly, used a drug that in the beginning of this very litigation, the other side said, well, why don't you use this? And they said for a one-drug protocol. We took the best-of-both protocols and said, well, then there will be a lethal dose of this. Now, Georgia has a five-minute wait. Do they have less of a dosage of pentobarbital? Do you know? I am unsure as I sit here, Your Honor. Something tells me it was three grams. I thought it was less, but I'm not sure about that. I believe it was three grams, but I would have to go back and check the record. Honestly, Your Honor, in the last week I've looked at so many lethal injection protocols, I can't quite recall all the numbers. This is all new to me. I've only been on this about six days. But when you do the check for consciousness, and I looked at some of the stuff that the state has here in terms of what's done, it looks like there is the possible shaking, the checking of the eyes, calling out the name in a loud voice, observing for a reaction. It almost looks like they're trying to see if there is any response to voice and tactile stimulation. Is there anything beyond that? No, Your Honor. Is there any monitor that's hooked up that would give you an indication that one could assess consciousness? No, Your Honor. After the prior litigation, and recall where Judge Robinson was in this litigation. Judge Robinson had made actual visits to the institution chamber. There is the pan-tilt camera, which allows the IV team to assess the person. So it's not just one person who engages in calling out the person's name to listen for sound. Engaging in the tactile stimulation, engaging in the eye brush, all of which were recommended and in fact far surpassed the Bayes standard because Bayes used none of them and still passed constitutional muster. Let me ask one question. Would Delaware, I guess obviously it doesn't apply to this case, but going forward in the future, would Delaware consider at some point an amendment of its protocols so that there would be a five-minute wait or whatever, as opposed to something longer than the two minutes that currently exist? Your Honor, I think, as we've seen, execution protocols are dynamic, and that is we always would want to look for the court that the words of this court, the words of the Delaware District Court in the first Jackson v. Danburg opinion, have rung very deeply with the Department of Correction to ensure that it does everything that it can, humanly, to take out what is very different than any medical procedure, and that is to ensure the humane ending of a life in a way that's reasonable. I do know, I think the court only need look at the history of this litigation, and that is that Delaware will continue to try to improve and ensure fewer risks where possible and reasonable. The reality is that the defense, I apologize, I keep doing defense during this case, but they continue to want to try and put up what are really unreasonable barriers. Dr. Weissel says, well, the consciousness check isn't any good, because you don't have, basically, an anesthesiologist doing it, and then would turn around and say, but the AMA and the American Board of Anesthesiology won't let me participate in this, nor will it allow them to give medical opinions as to anesthetics for the use. Obviously, Dr. Weissel has no problem saying, I have a problem with this, but would probably not tell anyone, here's what I think you should use. So it does place them in a catch-22. Let's set up some barriers that cannot be reached. Let's go back to sodium thiopental, now that we know that it's not made anymore, and step away from pentobarbital, the one that we talked about in the first litigation, in a dosage that we talked about in the first litigation. I suggest, Your Honor, that if there are improvements to be made, that the Department of Correction will continue to do that, just as it has done through this litigation, and just as it has gotten to where it is now. Wallace, let me ask you one question about the protocol. Yes, Judge Risch. Is there any place in the protocol where Delaware committed to use an FDA-approved anesthetic?  Not in the protocol, no, Your Honor. Your Honor, part of the problem with saying, let's use an FDA-approved anesthetic, is let's use an FDA-approved anesthetic for a purpose that the FDA would never approve it for, and that is the taking of a human life. In fact, pentobarbital is given in a dosage that is lethal for a purpose. There is a certain level, I know that the... When does it cause death, Mr. Wallace? How long does it take to cause death? Can you answer that? I apologize. I believe I was supposed to be... Judge Hartiman. I'm sorry. That wasn't me. That was not Judge Hartiman. That was Michael Wiseman. It was inappropriate, but I... I'm sorry. We'll hold off until we get back to you. I'm sorry. Go ahead. The point is, Your Honor, that the safeguards that the Eighth Amendment has set up have been followed as best as can possibly be done. What the two standards are under Bayes is that the protocol, in order to be unconstitutional, has to be sure or very likely to cause serious illness or needless suffering. That's at Bayes. That's when you take the plurality opinion, and I believe that Judge Fischer, that's part of the standard that Judge Fischer is adopting, or have an objectively intolerable risk of harm. What's clear is that execution procedures that are reasonably calculated to ensure swift and painless are immune from constitutional attack, and that's where we are here. The steep climb that Mr. Jackson has to make in this case is this. No other court has found pento barbital to violate the Eighth Amendment. Not the Ninth Circuit, not the Tenth Circuit, not the Eleventh Circuit, not the Georgia State Court. They simply have not, and I would suggest respectfully that yesterday Judge Robinson, looking at a Rule 60B motion in this case and the proffer that was made to determine whether or not she should reopen the judgment, certainly did not abuse her discretion. Judge Hardiman, do you have any questions? I keep asking and I didn't know. Not at this time, Judge Amber. Okay. Judge Fischer? Do you have any further questions? No, I have no further questions. I don't believe I do at this point either. Why don't we hear from Mr. Wiseman on this issue and then we'll see if there's any discussion we wish to have on the 2244 issue. Thank you, Your Honor, and I apologize for that. No, no problem. I understand. I have a few points I want to make. As far as an abusive discretion standard, it's our view that Judge Robinson made errors of law, and obviously errors of law can never be a proper exercise of discretion, and we've laid out those errors. But let's get to just the practical point that Mr. Wallace made. Yes. Which is that there is the ultimate fail-safe, which is that nothing moves forward without a consciousness check, and the person who's doing the consciousness check, at least two of whom on this team have medical training, nothing happens without that. And you're saying, well, there's a possibility that exists that maybe the person's conscious and that they can still suffer pain with the injunction of the second and third drugs, but, and I keep coming back, the problem I have is you have to show that in some way. Sure, and I think I can. You know, the consciousness check shows that the person is unconscious. It doesn't show that they're insensitive to pain. And, again, getting back to thiopental or another proper anesthetic, we would know for certain that after one minute or a minute and a half that, you know, most everyone would be insensitive to pain. You know, I have a couple of teenagers at home, and when I try to wake them up and I shake their shoulder and call their name, I don't usually get a response. If I injected, you know, these two drugs into them, they would be undergoing excruciating pain. And I think these consciousness checks only work if the anesthetic in place is a proper anesthetic. As far as other courts, the Florida Supreme Court this week state an execution to conduct a hearing on the very issue that is before this court. And I dare say that the Florida Supreme Court is, you know, it's one of the most active death penalty states. So this is a very real issue. And I would add that in terms of our stay, the reason this is last minute is not because we filed it anywhere near last minute. No, your brief covered that. I just wanted to make that point clear. Until May 31 that there was going to be a change in the drugs and the protocol. But if the one thing that comes out pretty clearly in Bayes is that we are not a – courts are not to engage in what is the best practices, you know, we don't resolve the scientific controversy. It is something that you go with what the people have. And the question is, is it cruel and unusual? And to make it cruel and unusual, you have to show that there is a substantial risk that the person suffers pain at the time of the second and third drugs being injected. And I don't see anything in the record. The only thing that I know of that's been put in the record so far is that in two executions, some of the people witnessing them thought that the person was not completely unconscious. Right. And our expert believes that they were in fact conscious, or at least one of them had his eyes open. So I think that shows something about the fallibility of consciousness checks generally. But, you know, if you want to translate that, this is a class action. We've got 20 members in our class. Those numbers, and just roughly translate them, that means we're looking at, you know, maybe two or three out of the 20 people in our class not being properly anesthetized. I think that's a pretty serious allegation on our part, one we think we can prove. But even in those two cases, did they go further with the administration of the drug protocol until they were certain that those persons were unconscious? Yeah, they did the consciousness check. Presumably they thought the person was unconscious, and they proceeded with the administration of the second and third drugs. And it appears to our expert that, you know, that wasn't, you know, valid, that they were, in fact, still sensible to pain. You know, I think, Judge, let me just put this back in here. It's extraordinary to take evidence in this case, but this is a pretty extraordinary circumstance. And, you know, I feel like I'm maybe repeating myself, but, you know, what's the one thing they could do to make this right? And I'll tell you what, we're on the record here. If they come back with an anesthetic that I can look up in a medical book and know that within two minutes it's going to render my client insensible, I'll withdraw the petition. And I'll not file it again. You've got my word on it. What witnesses yesterday did you have ready to go if the judge were to have those witnesses? I'm sorry? Yesterday, when you had to hear me for Judge Robinson. Well, she made it clear that it was not an evidentiary hearing. Her order specifically said it was an oral argument under Rule 68. That was her direction. You know, Dr. Wiesel is a medical professor at Harvard Medical School, and, you know, I assume he can't do it in five minutes. But, obviously, we would work as quickly as possible to gather all witnesses. And, you know, we understand the time pressures here. And, you know, I would think that under the whole set of allegations and the fact that they picked a drug that has no record, that we should be able to prove our contentions. You know, if it takes a week or takes two weeks, the Florida Supreme Court ordered a hearing, and I believe it's taking place this week. You know, so within a matter of days they've set up the hearing and done it. You know, it's either happened or it's about to happen is my information. I'm just looking at my notes if there's anything else I feel the need to cover. I think I hope my points have been made, and I certainly appreciate the court's help. And I must say, under the time constraints, the briefing of both sides was exceptional. Thank you, Your Honor. It is exceptional. Unless there's any other questions on this, let me just turn to Messrs. Wyckoff and Smith on 2244. Mr. Wyckoff. Yes, Your Honor. Yes, I'm sorry. Go ahead. It looks as, having looked at what the court did, another panel of the court in 2007, it looks as if the court looked pretty carefully, even though they dismissed it, at the evidence that was done before it concerning actual innocence. Now, you've made a claim that you have new evidence that includes, among other things, Mr. LeChet's admissions that he himself struck the fatal blows, new evidence about the state's concealed deals with key witnesses, and new evidence that Mr. Jackson was physically incapable of wielding the murder weapon. Starting with the last one first, that was before the court in 2007, was it not? Yes, Your Honor. And what about the evidence about the deals with key witnesses? Your Honor, yes, just to cut it short, all of this evidence was before the court, before the Third Circuit, last time we applied, Your Honor. And, as you know, habeas is one of the, what is it, Professor Chemerinsky says, it's like understanding the seven layers of hell. How do you get through, how does a court now say, well, we can just ignore what's been said before, and go ahead and reconsider evidence that was previously before the court four years ago? Yes, Your Honor. Habeas, of course, generally rules of res judicata don't apply in habeas, except to the extent that they're codified or imposed by Supreme Court case law. The Supreme Court made that clear years ago when they... But you have to have new evidence that could not be discovered through the exercise of due diligence. Even in those seven, one could say that if there was new evidence, it could have been discovered way back when, when the first habeas was filed in 2001, because you had about nine years. It just seems that... Yes, Your Honor, there are a couple of things about this. First of all, just if you look at the evidence, to me it seems very clear that there's a prima facie case, at least a prima facie case of innocence. And the other stuff, the questions about diligence, there's some of the evidence, for example, the shoulder injury, which obviously should have been available, would have been available to an effective lawyer at the time of trial. There's other evidence, and the Brady evidence, which was hidden and was not available. There's probably stuff in between. But the point of all this, of the diligence question, is that's really a very factually intensive question, which the district court should address in the first instance. But the point is, if the court in 2007 had this information that was supposedly, even you thought perhaps new since 2007, but you're agreeing that it wasn't, there's really nothing left on the blackboard for us to write on. Well, there are a couple of things, Your Honor. One thing is that the state has, I mean, to put this in the technical language of habeas, the state has basically argued that everything's barred by Section 2244B, either because there were claims that were previously presented. But those successive petition bars go to claims that were adjudicated in a habeas petition. None of these claims have been adjudicated in a habeas petition. We asked for permission to file the petition. It's as if it's the same as, for example, if you actually file a petition and it's dismissed without prejudice, there's no successive petition bar to those claims. And here it's even more clear there's no successive petition bar because there was never even a petition filed with those claims. But I'm looking at the, I think this is the order from 2007. Yes. The petitioner has failed to make a prima facie showing that his claims rest on newly discovered factual predicate that had proven and viewed what the existing evidence would establish by clearing convincing evidence that no reasonable fact finder would have found him guilty of the underlying offense, C2244B2. What I'm saying is I just don't see any way that we can entertain this new 2244 petition in light of what was done in 2007. And I'm saying there are a couple of reasons why you can. One is that there is no rule, the Supreme Court, neither the Supreme Court or Congress, has ever enacted a rule saying that a second PFA motion, as it's usually called, are because of the dismissal of the first one. Now, we've provided case law to you where some courts say yes and some courts say no, but we think that looking at the language of the habeas statute, the argument is much stronger that there is no bar to what you might call a successive PFA. So that's the first thing. The second thing is we actually do have a separate argument here. On Martinez? I beg your pardon? On Martinez? Martinez is one, and obviously your Honor is familiar with it. But the other issue is that, first, there's no indication in the 2007 order that the court decided the question of whether Mr. Jackson is innocent of the death penalty. It says innocent of the underlying offense. Actually, it's another open question. There are some circuits who say you have to show underlying offense. Some say innocence of the death penalty is enough and are proper, even if you believe that, given the proper, or even if the prior panel believes, given the proper that Mr. Jackson was still guilty of a felony murder, the proper certainly shows innocence of the death penalty as an Eighth Amendment matter under Tyson and Enman v. Florida. You're saying that the 2007 order, I thought the 2007 order used the words underlying offense. Did it not? Yes, it does. That tracks the language of the statute. Right. Now, some courts have said, well, although it says offense, it should also include innocence of the death penalty because it's for various reasons, which we've laid out in the brief. Right, right. And so another argument we have is that, assuming the panel in 2007 held that we hadn't made a prima facie showing of innocence of the offense because they believed he was still guilty of felony murder, we have now made a showing in prima facie innocence of the death penalty in this court, even if there's some kind of res judicata effect of the older order, the prior order does not affect that because that issue was not adjudicated. Okay. So basically the Martinez argument you made, the fact that there is no res judicata rules that have ever been codified or announced by the U.S. Supreme Court, and habeas is a landscape where you don't apply res judicata unless it's been specifically enacted. And then the third being that, as to innocence of the death penalty, there was no prior judgment at all, and therefore there's no res judicata. I have a few other arguments in the brief, but I think... Understood. Judge Fischer, Judge Hardiman, do you have any questions on 2244? I do not. I do not. Thank you, Your Honor. Okay. And I don't, I mean at this point I don't think I have any questions of Mr. Smith with respect to 2244. Thank you, Your Honor. Do you... I have just one question of Mr. Smith. In trying to go through the various actions that have been filed in this case, is it fair to say that there has never been a hearing, any of the state or federal court, on any of these allegations that are currently pending on actual innocence? A hearing, Your Honor? Yes. An evidentiary hearing, certainly I would say the trial is... Other than the trial, obviously. Has there been any evidentiary hearing on the affidavits that were filed by the inmates? Was there any on the question about the failure to disclose the plea deal with Mr. Johnson? I just don't see it anywhere in the record that an evidentiary hearing was held by any court. Evidentiary hearing, no, Your Honor, but Superior Court did address these claims in Jackson's successive motion for post-conviction relief. You mean, you're talking about the Judge Cooch opinion? Yes, Your Honor. Even that was done without hearing? Correct, Your Honor. Okay. Your Honor, this is Mr. Wyckoff. May I say one last thing in response to that? Sure. Thank you. That's really the point I was trying to make when I first opened up, is that we've got a really serious claim of innocence here, and there's never been an evidentiary hearing on this. All the details of the back-and-forth arguments about various sections of the U.S. Code, I think, should really be dealt with by the district court after hearing from the witnesses, and we're confident we can prove a convincing case of innocence here. Thank you. Thank you. And thanks, everyone. I realize that you've put in a tremendous amount of very intensive work in a very short period of time, and the quality of the briefing and the quality of the oral presentations really shows what professionals you are. We'll take the matter under advisement. If I could just ask one question. Sure. A follow-up question to Mr. Wyckoff. Sure. Go right ahead. In light of your answer that you just gave, just clarify for me, if you could, which section of AEDPA gives you the right to that hearing? AEDPA says that if the Court of Appeals finds a prima facie case, just a prima facie case, not actually, but a prima facie case that the, I don't have the exact language, but that the defendant is innocent and it's based on new evidence that couldn't have been discovered through due diligence, that you should authorize filing in the district court. But isn't the problem that you have that the 2007 order specifically said that the petitioner has failed to make a prima facie showing? Well, yes, the 2007 order says, doesn't actually track the statutory language, but assuming even that it did, it still doesn't have a res judicata effect generally. It leaves open the innocence of the death penalty, which the proffer shows, and it doesn't address our new issue about Martinez and the effective assistance of post-conviction counsel, which Your Honor referred to. All right. That was all I was asking for. Again, thank you, everyone. The members of the panel will be convening very shortly, and we will try to get at least a result of what our deliberation is to you probably within half an hour, certainly by 630. Thank you, Your Honor. Thank you. All right. Thank you very much, everyone. Mike and Tom, I'll pass you on.